[S. F. No. 15758. In Bank.—April 27, 1937.]

MARY STASULAT, Respondent, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

Thomas J. Straub, W. R. Dunn, W. H. Spaulding, Clinton F. Stanley and John J. Briare for Appellant.

Henry G. Sanford and George K. Ford for Respondent.

THOMPSON, J.—This case was taken over after decision by the District Court of Appeal, First District, Division One. The facts are taken from the opinion by Mr. Justice Gray sitting *pro tempore*.

"The surviving mother, brother and two sisters of a lineman employed by the Pacific Telephone and Telegraph Company sued the Pacific Gas and Electric Company to recover damages for his alleged wrongful death. They claimed that his death resulted from injuries which he received in a fall from a telephone pole on which he was working, and that the fall was due to his receiving an electric shock, caused by appellant's negligence. As to such negligence, they charged that appellant negligently permitted its power lines to sag and so contact a guy wire fastened to the telephone pole, that the guy wire became electrically charged by means of such contact, and that decedent received an electric shock

when he touched the guy wire. The jury found the facts as claimed by respondents, for it returned a verdict in their favor. From the judgment entered accordingly, appellant appeals, claiming the evidence is insufficient to establish (1) that its power lines contacted the guy wire, and (2) that, if they did, it was negligent in permitting them to do so.

■ " 'In considering appellant's claims of the insufficiency of the evidence it is our duty to so construe the evidence as to support the contentions of respondent to the extent that it is fairly susceptible of such construction, and in cases of conflict to accept as true that evidence which tends to sustain the verdict, unless it is inherently so improbable as to be palpably false.' (*Gett* v. *Pacific Gas & Elec. Co.,* 192 Cal. 621, 623 [221 Pac. 376].) Accordingly, only such evidence as is favorable to respondents will be stated. If several inferences can reasonably be deduced from the evidence, this court must accept that one which supports the verdict. (*Gorman* v. *County of Sacramento,* 92 Cal. App. 656 [268 Pac. 1083].)

"Three and one-half years before the accident, the Pacific Telephone and Telegraph Company erected and thereafter maintained on the west side of Stevenson street eighty-five feet southerly of the southern line of McCoppin street, in the city of San Francisco, a terminal pole about twenty-five feet high above the ground. The pole was braced by a guy wire with one end anchored in the ground fifteen feet southerly of the pole and with the other end wrapped twice around the pole eighteen inches above the crossarm. The guy wire was prevented from slipping down by a 'J'-hook (so called from its shape) forming part of it and placed on the inside or westerly side of the pole. A wooden crossarm, on which were fastened coils of wires, used to connect new subscribers, was affixed to the pole. The distance from the center of the crossarm to the top of the pole was three feet. About four inches below the center of the crossarm, tied to the pole, there was a messenger wire which supported, by hangars, the communication cable. This cable passed down into the rear of a terminal box, fastened to the north side of the pole, from which telephone lines were distributed to patrons in the vicinity. This box was four and one-quarter feet high, one and one-half feet wide, and one foot deep, and had attached thereto a metal handle on each side near the top. Immediately below

the box there was a wooden platform two feet wide and one and one-sixth feet deep, with an open space of nine inches between the inside edge of the platform and the front of the box. This was surrounded by a guard rail attached to the pole, two feet five inches above the platform and one foot seven inches in width. For its ascension, iron steps were provided on the north and south sides of the pole, beginning about eight feet above the ground. Before the erection of the telephone pole and continuously thereafter appellant had maintained four electrically charged lines, running diagonally in a northerly and southerly direction across Stevenson street. They were suspended from a crossarm fastened to a pole, located at the southeast corner of Stevenson and McCoppin streets, and from a bracket, attached to a building on the west side of Stevenson street. When the telephone pole was installed, the power lines were two feet above the messenger wire and the nearest was over two feet east of the pole.

"The deceased had been instructed to install a telephone at an address on McCoppin street. In order to do so, it was necessary to connect a drop wire with the communication cable. A resident of the neighborhood saw him climb the pole, with his back toward the street, until his waist was even with the platform. Devoting her attention to household duties for a couple of minutes, she next observed him lying in the street at the foot of the pole. The death certificate stated that the cause of his death was a crushing of the dorsal vertebrae with crushing of the spinal cord due to a fall.

"On the day after the accident, representatives of the telephone company and appellant visited the pole to investigate the cause of decedent's fall. At that time the supervisor of cable maintenance of the telephone company, upon inspection, found the four power wires of the appellant caught or jammed in the 'J'-hook with their insulation broken by the tension. Upon test, he learned that the guy wire was energized from the contact of power lines with the 'J'-hook and carried a current of 265 volts. In his opinion a person touching the guy wire and any ground on the pole would receive sufficient shock to cause him to lose his balance and thereby fall. Within an hour of the fall, decedent's immediate superior inspected the pole and saw the four power lines bunched into the 'J'-hook but he did not then ascertain

to whom they belonged. He was present at the investigation the next day and then learned they belonged to appellant. He stated that the power wires appeared to be in the same position on both occasions. ██ This evidence was sufficient to establish that appellant's power wire contacted the guy wire at the time of the accident. (*Dow* v. *Sunset Tel. & Tel. Co.*, 157 Cal. 182 [106 Pac. 587].)

''An engineer, employed by the telephone company, visited the scene of the accident on the fifth day after its occurrence. In the meantime; appellant had removed its power wires. By measuring, he found that the crossarm on appellant's pole to which its power wires had been attached, was 30.3 feet high above the ground level; that the bracket on the building, to which the power wires had also been suspended, was 25.58 feet high above the sidewalk and that the distance between the crossarm and bracket was 120 feet. He observed that appellant's pole deflected southerly for a distance which he estimated to be sixteen or seventeen inches. This deflection could have been due to any of several causes, but appeared to have taken place gradually. Assuming that, when the pole was perpendicular, the wires sagged one foot, and that the wires were 'number 8 soft drawn, solid double braided weather wire', he calculated, by means of a formula, that the deflection of the pole caused the wires to sag seven feet downward at the telephone pole. The weight and elasticity of the wire, which were vital factors in the computation, were derived from his assumption of its type. Appellant introduced into evidence specimens of number 8 and number 4 wire. The latter is larger than the former. The only testimony as to size of wire used in the power lines was given by appellant's lineman who testified that it was number 4. Obviously, since the calculation related to a different size of wire than that of which the power lines were composed, it had no evidentiary value in the case. The engineer by plotting on coordinated paper the curve of the power wires with such seven-foot sag found that the wire nearest the telephone pole was one foot away and the farthest was two and one-half feet. This testimony is also valueless, because it deals with a seven-foot sag, which, as has been seen, concerns a type of wire not here involved.

██ ''When the telephone pole was erected, the power wires were two feet east of it. When the accident occurred,

the power wires contacted the 'J'-hook on the west side of the telephone pole. To establish the cause of the changed position of the power wires, respondents relied solely upon the engineer's testimony. In considering their argument on this matter, the engineer's testimony will be considered as applicable to the case. As plotted by him, the distance between the sagging wires and the telephone pole did not give the clearance required by the rules of the Railroad Commission, introduced in evidence by respondents. The failure of appellant to maintain their power lines with the clearance required was negligence *per se*. (*Howell* v. *San Joaquin L. & P. Corp.*, 87 Cal. App. 44 [261 Pac. 1107].) Appellant was required to make reasonable and proper inspection of its power lines and to use due diligence to discover and repair their dangerous sagging. ■ Notice of this sagging may be implied if it existed for such a length of time that it should have been known. (*Tackett* v. *Henderson Brothers Co.*, 12 Cal. App. 658 [108 Pac. 151] ; *Roberts* v. *Pacific Gas & Elec. Co.*, 102 Cal. App. 422 [283 Pac. 353].) Since the engineer stated that the deflection of the pole appeared to have been gradual, it is reasonable to infer that the sagging was also gradual and therefore had continued for a considerable time. The jury was justified in finding that appellant was negligent in maintaining the power lines in a sagging condition.''

■ It is the position of the appellant that, conceding the fatal fall was caused by an electric shock received from the energized guy wire and that the appellant was negligent in permitting its wires to sag and remain in a position which did not give the clearance required by the rules of the Railroad Commission, such negligence was not the proximate cause of the accident, since, hanging in their normal position and as replaced after the accident, the appellant's wires were harmless for, although they did not meet the clearance requirements, they were two feet above the messenger and cable, did not come in contact with the telephone pole or any of its equipment and were insulated. The appellant contends the chain of causation from its negligence was broken by an efficient intervening cause which did not flow as a natural consequence from the negligence of the appellant; that the change of position of the wires was in no way connected with any negligence in allowing the wires to sag but was the un-

foreseeable act of an independent agent. The physical factors are set forth in the opinion of the district court.

"Originally the power wires were two feet easterly of the terminal pole and two feet above the messenger wire. As the messenger wire was four inches below the center of the crossarm, which was three feet below the top of the terminal pole, the power wires were then one foot four inches below the top of this pole. Since the engineer calculated that the power wires had sagged six feet more than their initial sagging of one foot, the additional sagging would place them seven feet four inches below the top of the pole. The 'J'-hook was eighteen inches above the crossarm, or one and one-half feet below the top of the pole on the opposite or west side. The witnesses all agreed that the power wires could not have been lifted to the top of the pole so that they could fall into contact with the 'J'-hook by the wind or other natural causes. They also agreed that such lifting could only have occurred through intervention of a human agency and that no inexperienced person would have so changed the position of the wires, because of his appreciation of the danger of so doing."

The rules for determining whether the independent force which acts upon the situation created by the original negligence is such an intervening cause that the original negligence is no longer a proximate cause of the injury are set forth in sections 442 to 453 of the Restatement of the Law of Torts and, as so reframed, lead to the conclusion that the appellant is not liable in the present case, even though it negligently allowed its wires to sag, if the realizable likelihood of the second negligent act is not one of the factors contributing to the negligent character of the first act; if a reasonable man, knowing the situation created by the first act, would regard it as highly extraordinary that the intervening act should have been done, or the act, although not an extraordinary response to the situation created by the original negligence, is done in an extraordinarily negligent manner. (See sec. 447 of the Restatement and comment thereon.) Our own cases support these propositions by the statement of the more general rule that, although it is not necessary to preserve the chain of causation from the original negligence that the precise nature of the second negligent act should reasonably have been anticipated, it is necessary that some such negli-

gence should have been anticipated as reasonably likely to follow as a natural and ordinary consequence of the situation created by the original negligent act. (*Sawyer* v. *Southern Cal. Gas Co.*, 206 Cal. 366 [274 Pac. 544]; *Schwartz* v. *California etc. Gas Co.*, 163 Cal. 398 [125 Pac. 1044]; *Hale* v. *Pacific Tel. & Tel. Co.*, 42 Cal. App. 55 [183 Pac. 280]; *Polloni* v. *Ryland*, 28 Cal. App. 51 [151 Pac. 296].) Although, as a general rule, the question whether the original negligence is a proximate cause of the injury is one of fact for the jury. (*Lacy* v. *Pacific G. & E. Co.*, 220 Cal. 97, 101 [29 Pac. (2d) 781]), it must be said here that, as a matter of law, the issue of proximate cause was not proved. (Restatement of the Law of Torts, sec. 453.) There was no evidence upon which the jury could reasonably conclude that the lifting of the wires a foot and a half over the top of the pole and the crowding of the four wires into the "J"-hook with such force as to break their insulation was an act which should reasonably have been foreseen and anticipated as a result of the sagged condition of the wires, or even that there was more than a remote and slight probability of the occurrence of any positive act which would bring the wires in contact with the telephone pole or its equipment, much less destroy the insulation. This is especially so in the light of the fact that none but experienced linemen, who know that such an act would but increase the danger inherent in the sagged condition, could reasonably be expected to climb the pole and interfere in any way with the wires of the defendant company. There is no contention that there was any such interference by any employee of the defendant.

The judgment is reversed.

Edmonds, J., Shenk, J., Seawell, J., and Curtis, J., concurred.

Rehearing denied.